UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cr-46-TRM-SKL |
| | ) | |
| JAMAAL PARKER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Jamaal Parker ("Defendant")

[Doc. 145].   Defendant's motion seeks to suppress all evidence obtained as a result of his stop

and arrest.   Plaintiff United States of America ("Government") filed a response in opposition to

the motion [Doc. 162].   The motion to suppress was referred for a report and recommendation by

standing order pursuant to 28 U.S.C. § 636(b).   An evidentiary hearing on the motion was held on

November 25, 2019.   Both parties timely submitted post-hearing briefs [Docs. 191 & 192].   This

matter is now ripe.[1]

For the reason addressed below, I **FIND** no constitutional violation occurred with respect

to all claims raised in Defendant's motion to suppress and I **RECOMMEND** that Defendant's

---

[1] At the inception of the hearing, Defendant's counsel stated that Defendant wanted a continuance of the hearing to engage in further discussions with his counsel.   The suppression hearing had already been continued twice on motions of Defendant, and Defendant had been forewarned that "[a]bsent a showing of extraordinary circumstances, no further request for a continuance of the hearing is likely to be granted." [Doc. 178].   The offered reason for verbally requesting a third continuance on the day of the hearing was held to be wholly unjustified by the record and was denied.   Counsel acknowledged he was prepared to proceed.   At no point during the hearing did Defendant seek additional time to obtain evidence or prepare for or rebut the witnesses/evidence presented by the Government.   Moreover, on several occasions, as requested, Defendant was given time to consult with his attorney during the hearing and was also allowed to file a post-hearing brief to address his arguments.

motion to suppress be **DENIED**.

## I.     FACTUAL BACKGROUND

The Government called the following witnesses: Agent William Wise ("Agent Wise") with the Drug Enforcement Administration ("DEA") and Georgia State Patrol ("GSP") troopers Eric Ramsey ("Trooper Ramsey") and Jordan Ennis ("Trooper Ennis").   Wise has very extensive experience in narcotics investigations and the troopers have extensive experience with the GSP and the Criminal Interdiction Unit as detailed during the hearing.   Defendant called no witnesses. The collective evidence very credibly establishes the following.

In late 2018 and early 2019, DEA agents were engaged in an investigation of cocaine and cocaine base distribution in the Eastern District of Tennessee.   DEA utilized a series of court authorized Title III wiretaps, tracking warrants, confidential source(s), a controlled buy, and other investigative techniques in furtherance of the investigation.   In the investigation, DEA determined a source ("Source") located in Atlanta, Georgia was providing Defendant and a co-defendant, Jerriod Sivels ("Sivels"), with cocaine for distribution in the Chattanooga, Tennessee, area. Sivels was the target of three court authorized wiretaps and Defendant was the target of one court authorized wiretap.   In January 2019, Defendant was also recorded communicating with Sivels while Defendant was in custody and utilizing a jailhouse telephone.   Based on the investigation, Agent Wise concluded Defendant was a leader in the drug trafficking at issue.

In January 2019, calls between Sivels and Defendant while Defendant was in jail and other surveillance indicated that Sivels, and another co-defendant, Anthony Poindexter ("Poindexter"), traveled to Atlanta in separate vehicles to meet with the Source to obtain cocaine to distribute. On February 16, 2019, after Defendant had been released from custody, DEA intercepted communications indicating that Defendant, Sivels, and Poindexter again planned to travel to

2

Atlanta, Georgia, to obtain cocaine. DEA surveilled Defendant and Sivels meet Poindexter at Poindexter's residence. Defendant and Sivels were then observed traveling southbound on Interstate 75 in Defendant's vehicle. DEA also observed Poindexter travel southbound on Interstate 75 in another vehicle. DEA again physically and electronically surveilled both vehicles as they traveled to Atlanta. Defendant and Sivels eventually parked at 838 Mildred Place NW, a residence in Atlanta. Poindexter's vehicle also traveled toward the same residence. For investigative integrity and because DEA had information that the Source utilized "lookouts" to attempt to detect physical surveillance efforts, DEA terminated physical surveillance of Poindexter as he neared the residence used by the suspected Source, but tracking devices previously installed on the vehicles indicated both vehicles parked at the same location.

About 15 minutes after arriving at the residence, both vehicles left the residence and DEA resumed physical surveillance. As Poindexter traveled northbound on Interstate 75, a GSP trooper initiated a traffic stop of Poindexter for traffic violations at DEA's request. As the GSP trooper initiated the stop, Poindexter called Sivels (who was with Defendant) and told Sivels he was being stopped. During a search of Poindexter's vehicle, GSP troopers recovered eight kilograms of cocaine. During the stop, Defendant's vehicle was observed being driven northbound past the stop, exiting the interstate, reentering the interstate traveling southbound, and past the stop again.

Based on his extensive training, experience, observations, and investigation, Agent Wise concluded Poindexter was a drug courier working for Sivels and Defendant. Intercepted calls of both Sivels and Defendant indicated they suffered a "loss" as a result of Poindexter's arrest, but would continue to do business. Over wiretap intercepts, Sivels discussed selling property he owned with Defendant to cover the loss.

3

A couple of weeks later, on March 2, 2019, DEA agents again intercepted communications that indicated Defendant and Sivels were arranging yet another trip in separate vehicles to Atlanta to obtain cocaine. DEA agents observed Defendant and his passenger/girlfriend travel to Atlanta in Defendant's vehicle, a black Chevrolet Silverado truck. Defendant communicated with both Sivels and the Source by telephone during his travel to Atlanta. DEA agents physically and electronically surveilled both Defendant and Sivels' vehicles during the trip and both vehicles parked at 838 Mildred Place NW for a short time together. The tracking device installed on Defendant's truck indicated it left the residence about 15 to 20 minutes after arrival. DEA agents then electronically and physically surveilled Defendant as he traveled to a gas station, then a restaurant for an extended stay, and then northbound on Interstate 75 toward Chattanooga.

DEA planned to conduct a "walled off traffic stop" of Defendant to protect the integrity of the ongoing investigation. Therefore, DEA arranged for a "whisper stop" by the GSP Criminal Interdiction Unit to avoid revealing information known by law enforcement to Defendant. In other words, GSP troopers were asked to attempt to develop probable cause to initiate a traffic stop to try to "get in" the truck without exposing the existence of the ongoing investigation.

Four patrol officers in the Criminal Interdiction Unit, including Trooper Ramsey and Trooper Ennis, set up in marked GSP vehicles along the interstate in north Georgia. As Defendant's truck traveled north on the interstate his location was transmitted to the troopers by DEA agents, some of whom were following Defendant. The troopers had been advised that Defendant was suspected of having cocaine in his truck, had traveled from Tennessee to pick up drugs and would be traveling back to Tennessee that night with the drugs, had a female passenger in his vehicle, had a history of fleeing and evading police, and was thought to be armed. Given this information, the four troopers set up at intervals to address possible flight.

4

As Defendant's truck passed through a lit area of the interstate where Trooper Ramsey was parked, Trooper Ramsey observed Defendant's truck had "extremely dark" window tint on the side windows. Trooper Ramsey testified extensively about his training and experience detecting unlawful window tint and how he concluded, even though it was a dark night, that the truck's side window tint violated Georgia law. As Trooper Ramsey caught up to Defendant's truck, he observed what he believed was another violation of Georgia law because Defendant was following a vehicle more closely than was reasonable or prudent. Trooper Ramsey testified extensively about the "vague" language used in the Georgia following-too-closely-statute, and how he determined that Defendant's vehicle was following another vehicle too closely, based in part on the state driver's handbook.

Given his determination that he had developed "probable cause" for a traffic stop, Trooper Ramsey activated his emergency equipment and initiated a traffic stop of Defendant's truck. As a result of activating his lights, his functioning dash camera made an audio and video recording of events. While the recording equipment does not back up far enough to record the truck as it passed the parked patrol car, it does contain footage of what Trooper Ramsey contends was the following too closely violation.

Defendant's truck pulled over to the right-hand shoulder of the interstate in response to Trooper Ramsey's activation of his blue lights and siren. As Trooper Ramsey approached the passenger side of the stopped truck on foot, he attempted to shine his flashlight through the passenger windows but the window tint was so dark that he could not see into the vehicle. Trooper Ramsey yelled to the occupants to roll the windows down. Instead of complying, Defendant rapidly accelerated and fled from the stop.

GSP Trooper Ennis, another experienced GSP Criminal Interdiction Unit member, had

stopped his patrol vehicle a short distance behind Trooper Ramsey in anticipation of possible flight. As Defendant fled, Trooper Ennis pursued Defendant with his emergency equipment activated (and recording events). Defendant did not stop and Trooper Ramsey joined the pursuit. During the high-speed chase that lasted about two miles, Defendant committed several traffic violations including speeding about 100 miles per hour, cutting other vehicles off, and passing other vehicles on the left-hand shoulder of the interstate. Trooper Ennis eventually disabled Defendant's truck by performing a Precision Immobilization Technique ("PIT") maneuver to end the pursuit. When the PIT maneuver was implemented, Defendant's vehicle spun around in the interstate and came to rest facing south in the right lane of the northbound lanes of traffic.

After Defendant's truck came to rest, Defendant jumped from the passenger side door into the interstate and fled on foot carrying a bookbag/backpack ("bag") across the northbound travel lanes, the median, and southbound travel lanes into a wooded embankment area. Law enforcement officers gave chase on foot. Trooper Ennis was able to take Defendant into custody (after a failed taser deployment) at the wood line past the left side of the southbound lanes. Defendant's bag was nearby.

Approximately four kilograms of cocaine was found in Defendant's bag. Law enforcement officers also searched Defendant's vehicle and found a handgun on the driver's side floorboard. None of the testifying witnesses indicated he was the first to search the truck and observe the gun. Although there was speculation from Trooper Ennis that the officer who arrested the girlfriend may have been the first to see the gun, the testimony did not identify exactly when or which officer searched the truck. The girlfriend, like the Defendant, exited from the passenger side of the truck but did not flee. Trooper Ennis indicated the gun was quickly located in the truck by another officer before Trooper Ennis first observed it on the floorboard, which was soon after

6

Trooper Ennis placed Defendant into physical custody.

Defendant was charged with violations of Georgia law including fleeing or attempted to elude a police officer, drug trafficking, and other violations. Subsequently, Defendant was indicted in this Court on drug and money laundering conspiracy charges [Doc. 71].

During the hearing, the Government offered the recording from Trooper Ramsey's dash camera (Exhibit 1), the recording from Trooper Ennis's dash camera (Exhibit 2), a photograph of Defendant's bag (Exhibit 3), a photograph of the four bricks of cocaine located in the bag (Exhibit 4), and a photograph of the gun lying in the floorboard of Defendant's truck (Exhibit 5). Defendant offered no exhibits.

## II. STANDARDS

The Fourth Amendment guards against, *inter alia*, unreasonable seizure and searches of a person. U.S. Const. amend. IV. Encounters between police and citizens can be grouped into three types: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry*[2] stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quotation marks omitted) (quoting *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008)).[3]

Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all

---

[2] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[3] "Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (citing *Reid v. Georgia*, 448 U.S. 438, 440 (1980)). The Government does not contend there was a consensual encounter.

7

evidence obtained as a result of the seizure must be suppressed. *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). This remedy of exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted). It is the Government's burden, however, to demonstrate by a preponderance of the evidence that a particular search or seizure is constitutional. *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citing *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

## III. ANALYSIS

Defendant's motion seeks suppression of all evidence seized or arising from the "stop(s) of his vehicle" and related searches. First, he argues the initial (attempted) stop was unlawful because law enforcement did not have a reasonable and articulable suspicion of criminality since the physically and electronically surveilled behaviors could describe "perfectly innocent behaviors" [Doc. 145 at Page ID # 531]. Second, Defendant contends that since the initial stop was unlawful, his subsequent stop, arrest and searches were also unlawful because Georgia law prohibits only obstruction of lawful police conduct and, therefore, his flight did not supply cause for a stop. Finally, Defendant argues that even if this Court finds the stop(s) and seizure of cocaine to be lawful, the seizure of Defendant's firearm from his truck is still unlawful because Defendant was in custody and far removed from the vehicle at the time of the gun's seizure and

8

no reasonable law enforcement officer would have believed it possible for Defendant to access the firearm.

## A. The "Stop(s)"

### 1. Standards

To be unlawful, a seizure must be unreasonable. *Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."). All seizures—including brief investigatory stops—receive Fourth Amendment protection. *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). Officers may temporarily seize a person, i.e., conduct a *Terry* stop, if the officers have "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts the officers know at the time of the stop. *Terry*, 392 U.S. at 21-22, 27; *United States v. Bentley,* 29 F.3d 1073, 1075 (6th Cir. 1994) ("[W]here a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances.").

An officer who decides to conduct a *Terry* stop must be acting on more than his "inchoate and unparticularized suspicion or 'hunch;'" rather, he must rely on "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox,* 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). Officers may "draw on their own experience and specialized training to make inferences

9

from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citation and quotation marks omitted). This is not a high bar—all that is needed is "a minimal level of objective justification" for the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7); *see also Navarette v. California*, 572 U.S. 393, 396-97 (2014).

Moreover, it is well-settled that an officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (citations omitted). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). "[P]robable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "The establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989) (quoting *Gates*, 462 U.S. at 244 n.13), *superseded on other grounds by* 18 U.S.C. § 3742(e). A probable cause determination depends on whether, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations omitted). The reviewing court must assess probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citation omitted).

### 1. The Attempted Stop

Evidence seized during an unlawful traffic stop must be suppressed. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). If either the initial traffic stop or the scope and duration of the stop is unlawful, then the evidence obtained from that illegality may be excluded. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *see also Blair*, 524 F.3d at 748. In this case, Defendant contests only the basis for, not the scope or duration of, the attempted stop. Yet, the uncontradicted testimony is that Defendant was following another vehicle too closely and had unlawfully tinted windows in violation of Georgia law. *See* Ga. Code Ann. § 40-6-49(a) (it is unlawful for a "driver of a motor vehicle [to] follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway")[4] and Ga. Code Ann. § 40-8-73.1(b)(2) (it is unlawful to operate a vehicle with tinted windows that "reduce light transmission through the windshield or window to less than 32 percent, plus or minus 3 percent").[5]

The United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to

---

[4] While the United States Court of Appeals for the Sixth Circuit has expressed some reservations regarding the subjectivity of Tennessee's similarly worded statute, it has held that were an officer has an "objectively verifiable reason" supporting probable cause of a violation of the following-too-closely statute, a stop is supported by probable cause. *United States v. Huff*, 630 F. App'x 471, 496 (6th Cir. 2015). Given the holding in *Huff*, and the other bases for the pertinent seizure in this case (like the tint violation), it is not necessary to address the issue of any vagueness challenges to Georgia Code Annotated § 40-6-49(a).

[5] Applying Georgia Code Annotated § 40-8-73.1(b)(2), the United States Court of Appeals for the Eleventh Circuit has held a stop was supported by reasonable suspicion where an officer reasonably believed that a vehicle's windows were in violation of Georgia's tint law. *See United States v. Moody*, 240 F. App'x 858, 859 (11th Cir. 2007).

Case 1:19-cr-00046-TRM-SKL   Document 194   Filed 12/05/19   Page 11 of 25
PageID #: 1141

make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748; *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that stopping an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion standard is sufficient for ongoing traffic violation but not a completed misdemeanor). Although for the reasons addressed below the attempted stop is not material, the attempted stop clearly passes constitutional muster based on the credible facts outlined above, even when the stricter probable cause standard is applied to the traffic stop.

By all accounts, Trooper Ramsey was looking for any lawful reason to stop Defendant. Defendant unwittingly provided that reason by committing traffic violations. Therefore, whatever other subjective reasons law enforcement had for making the stop are legally irrelevant. *See, e.g., United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when he observed [defendant] not wearing a seatbelt, [officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine [the constitutionality of the stop].”); *see also United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010) (rejecting the district court's analysis as to why the officer "*really*" stopped the vehicle); *Hill*, 195 F.3d at 264 ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle." (citing *Whren*, 517 U.S. at 812-13 (1996))); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful" (citations omitted)).

I **FIND** Trooper Ramsey credibly testified as to facts showing probable cause to make the

12

attempted stop; that is based on Trooper Ramsey's training and experience, he observed information sufficient to warrant a prudent person to believe that Defendant had committed or was committing traffic offenses in violation of Georgia law, by following too closely and having too darkly tinted windows. It is well established that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Blair*, 524 F.3d at 748 (original quotation marks, brackets, and citation omitted). Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred . . . ." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.* Accordingly, I **FIND** the Government has met its burden to establish probable cause for the attempted stop**.**

Furthermore, even if the Government had failed to meet its burden, the inquiry would not end in Defendant's favor. To address the Fourth Amendment issues raised in a particular seizure, a court must determine the moment of seizure. Because the physical capture of a person is sufficient, but not necessary to seize a person, an officer can seize a person either through physical force or a show of authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007) (holding a seizure within the meaning of the Fourth Amendment occurs when a law enforcement officer "by means of physical force or show of authority terminates or restrains [a person's] freedom of movement through means intentionally applied." (citations, quotation marks and emphasis omitted)).

I **FIND** that although Trooper Ramsey attempted a traffic stop, seizure did not occur because Defendant did not submit or yield to the trooper's show of authority. *See id.* ("A police officer may make a seizure by a show of authority and without the use of physical force, but there

13

is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (quoting *California v. Hodari D.*, 499 U.S. 621, 626 n.2 (1991))); *see also Scozzari v. McGraw*, 500 F. App'x 421, 424 (6th Cir. 2012) ("However—and critically for purposes of this case—in order to be seized a person must actually yield to a showing of authority." (citations omitted)); *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011) (holding a suspect is not seized until he submits to the officers show of authority, even if the officers have their guns drawn before the suspect submits); *United States v. McCauley,* 548 F.3d 440, 441-44 (6th Cir. 2008) (holding a man who "ignored" the command of an officer to stop was not seized until the officer drew his weapon and the suspect raised his arms).

Because no seizure was actually effectuated when Trooper Ramsey attempted to pull Defendant over, the existence of reasonable suspicion or probable cause at that point in time is immaterial. *See McCauley*, 548 F.3d at 442 ("We determine whether reasonable suspicion existed at the point of seizure—not, as appellant's counsel contended at oral argument, at the point of *attempted* seizure."); *see also Hodari D.*, 499 U.S. at 629 (suspect fleeing on foot not seized until he was physically tackled, such that the "cocaine abandoned while he was running was in this case not the fruit of a seizure"); *United States v. Jones*, 673 F.3d 497, 501-02 (6th Cir. 2012) (holding that "because Defendant did not comply with [the officer's] commands to stop, he was not seized until [the officer] physically restrained him by taking him down and handcuffing him."); *United States v. George*, 456 F. App'x 530, 532 (6th Cir. 2012) (distinguishing *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010), explaining: "Johnson was seized when he stopped moving because that was the point at which he yielded to the officers' authority, regardless of his subsequent failure to raise his hands. Unlike in Johnson, there was no initial compliance in this case," because rather than acknowledging the officer's order, the suspect "continued to move

14

around the car and began running after Salyers pulled his weapon."); *Jones*, 562 F.3d at 774-75 (holding a passenger who jumped out of a car, as if to run away, after the car was hemmed in by police, was not seized until he complied with an officer's order to stop, such that "the district court, in measuring reasonable suspicion, should have considered all of [the arresting officer's] observations" up to that point).

Accordingly, I **FIND** Defendant was not seized until subdued by Trooper Ennis after the vehicle and foot chase. As Defendant was not seized until after his flight, whether the attempted stop was constitutional is of no significance to Defendant's arguments for suppression. As a result, this aspect of Defendant's motion to suppress should be denied.

### 2. The Seizure

I have concluded Defendant was not seized until after his flight. Therefore, the pertinent question is whether probable cause existed *at that point* to support Defendant's arrest. *See United States v. Dickens*, 748 F. App'x 31, 36 (6th Cir. 2018) ("In determining whether probable cause exists, we may not look to events that occurred after the [arrest] or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the [arrest]." (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998) (alterations in original))).

Defendant argues there was no probable cause to support his arrest because the initial stop was unlawful. Citing Georgia Code Annotated §16-10-24, *United States v. Fuller*, 120 F. Supp. 3d 669 (E.D. Mich. 2015), and *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998), Defendant argues his "actions in leaving the initial stop did not supply law enforcement with separate cause to initiate a second stop since the initial stop was unlawful." [Doc. 145 at Page ID # 532]. I respectfully disagree with both arguments and Defendant's citations do not seem to help his cause.

15

In *Fuller*, the district court merely held "cases from the Tenth Circuit, the Sixth Circuit, and the highest courts of Florida, Colorado, and Ohio firmly establish that as soon as an officer's reasonable suspicion for a stop is dispelled, the officer may not further detain a suspect in order to obtain additional information through a warrant check or records review." 120 F. Supp. 3d at 681-82 (citation omitted). In this case, however, reasonable suspicion was never dispelled.

*Thorton* involved a dispute between former roommates, Mark Thornton and Marjorie Mullis. They had agreed Mullis would return Thornton's keys and Thornton would return Mullis's mattress. Mullis asked police to help with the exchange, but when they arrived, Thornton refused to let them in or otherwise return the mattress. The police eventually charged into his apartment, threw him to the floor, then "dragged him outside and shoved him into a police car," all with the objective of forcing him to make the key/mattress exchange. 132 F.3d at 1398. Thornton and a third person who became tangentially involved were arrested on felony "obstruction" charges, which were later dismissed. Thornton then brought a civil rights action against the arresting officers, alleging he was arrested without probable cause and was the victim of excessive force.

The district court denied the officers' motion for summary judgment, finding they were not entitled to qualified immunity. The Court of Appeals for the Eleventh Circuit affirmed. The court reasoned that the "obstruction" statute requires a person to "knowingly and willfully obstruct[] or hinder[] any law enforcement officer in the lawful discharge of his official duties," 132 F.3d at 1399 (quotation marks omitted) (quoting Ga. Code Ann. § 16-10-24), and that no reasonable officer would have believed they were discharging their official duties by attempting to force Thornton to return Mullis's mattress in exchange for Thornton's key.

Not only has *Thornton* subsequently been called into doubt, *see Jackson v. Sauls*, 206 F.3d

16

1156, 1171 & 1171 n.20 (11th Cir. 2000), it is clearly distinguishable and lacks even persuasive authority to the instant case.  Flight after a lawful command to halt, as occurred in this case, unequivocally constitutes obstruction of an officer under Georgia law.  *See e.g., Cofield v. State*, 695 S.E.2d 696, 698 (Ga. Ct. App. 2010) (citing Ga. Code Ann. § 16-10-24 (a)); *see also Clowers v. State*, 750 S.E.2d 169, 173 (Ga. Ct. App. 2013) (same).

As argued by the Government, even if the initial attempted stop were to be (somehow) construed as illegal, Defendant's flight provided probable cause for his arrest.  *See e.g.*, *United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010) (holding it is "widely recognized that [i]f a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." (quotation marks omitted) (quoting *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481, at *5 (6th Cir. Nov 28, 2000) (unpublished table decision))).  High-speed flight is an intervening act that "purge[s] the taint" of an illegal seizure or detention.  *See Castillo*, 2000 WL 1800481 at *6.

As noted above, I **FIND** the initial attempted stop was entirely lawful based on the traffic violations.  Moreover, based on the collective knowledge of all the agents and troopers working together on the scene and in communication with each other,[6]  the troopers had (at least) reasonable suspicion that Defendant was engaged in illegal drug activity prior to initiating the stop.  *See United States v. Lyons*, 687 F.3d 754, 766-67 (6th Cir. 2012) (collective knowledge of DEA in

---

[6] Without a doubt, it is permissible for one officer to rely on another officer's observations for purposes of establishing probable cause.  *See United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) (holding that for assessing whether probable cause exists, the court "mutually impute[s] the knowledge of all the agents working together on the scene and in communication with each other"); *accord United States v. Rodriguez-Suazo*, 346 F.3d 637, 650 (6th Cir. 2003) (citation omitted); *see also Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." (citing cases)).

17

drug trafficking investigation supports reasonable suspicion for state police to stop vehicle).

When Trooper Ramsey approached Defendant, whom he reasonably suspected was engaged in criminal activity (and whom he had observed committing traffic violations), Defendant fled and continued that flight in spite of the troopers' lawful efforts to seize Defendant. Even without considering the probable cause supporting the traffic violations, I **FIND** Defendant's flight caused the troopers' reasonable suspicion of criminal activity to ripen into probable cause. *See e.g., Williams v. United States*, 632 F. App'x 816, 823 (6th Cir. 2015) (holding in § 2255 case that because the officers had reasonable suspicion of criminal activity, they had probable cause to arrest Williams once he fled); *United States v. Dotson*, 49 F.3d 227, 230-31 (6th Cir. 1995) (holding that if officers have reasonable suspicion of criminal activity, and the suspect flees when the officers attempt to stop him, the officers' reasonable suspicion ripens into probable cause); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (citations omitted)). Therefore, even if the troopers did not have probable cause to arrest Defendant when the attempted stop was initiated, Defendant's dangerous flight in combination with the reasonable suspicion of drug trafficking—not to mention the numerous traffic violations Defendant committed before and during his perilous flight—provided it.

Considering the totality of the circumstances, I **FIND** the troopers' reasonable suspicion clearly ripened into probable cause to arrest Defendant and his ensuing post-flight arrest was completely lawful. *See Williams*, 632 F. App'x. at 823 (citing *United States v. Alexander*, 528 F. App'x 515, 519 (6th Cir. 2013); *Dotson*, 49 F.3d at 230-31).

Accordingly, this aspect of Defendant's motion to suppress should be denied.

18

### 3. Bag Search

The bag search was not directly contested in Defendant's motion, other than perhaps under a fruit-of-the-poisonous-tree theory concerning the stop, but was arguably addressed to some degree during the hearing. Therefore, in the interest of completeness, I will address the search of Defendant's bag. I **FIND** the warrantless search of Defendant's bag was, at a minimum, a proper search incident to Defendant's lawful arrest.

Under the "search incident to arrest" exception to the warrant requirement, after a lawful arrest the police may search the person of the arrestee, as well as the area within his immediate control. *See, e.g., Birchfield v. North Dakota,* 136 S. Ct. 2160, 2176 (2016); *see also United States v. Dillard*, 78 F. App'x 505, 512 (6th Cir. 2003) (holding that "a search of the briefcase was proper as a proper search incident to a lawful arrest . . . [I]t would be appropriate and prudent to search the person of the defendant and the area within his immediate control and various things in his control." (quotation marks and citation omitted)). "The mere fact that an arrestee has been subdued and handcuffed in no way signals the end of exigent circumstances, and cannot preclude a search of the arrestee's person and surrounding area." *Id.* at 513.

The search of Defendant's bag took place within minutes of his detention at the scene of his arrest and indisputably was a valid search incident to arrest. Moreover, for the reasons addressed below, the officers had probable cause for the bag search. Accordingly, any aspect of Defendant's motion to suppress related to a search of the bag should be denied.

### 4. Vehicle Search

The parties' post-hearing briefs focus on the lawfulness of the vehicle search. Before turning to the new arguments raised in the post-hearing briefs concerning the vehicle search, I will first address Defendant's original argument (made in the motion) that even if his stop, arrest and

the search of his bag were lawful, the search of his vehicle was not under the reasoning of *Arizona v. Gant*, 556 U.S. 332 (2009).

In *Gant*, the Supreme Court determined that law enforcement officials may search a vehicle incident to a lawful arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id*. at 351.[7]   Defendant argues that, because he was not within reaching distance of his vehicle at the time of his arrest, the search of his truck was unlawful.   Defendant's *Gant* argument, which rests on the faulty premise that the search of his truck was conducted as an incident to his arrest, falls flat because the search of his truck was not performed incident to his arrest.   Instead, the vehicle search was based on law enforcement's probable cause to believe that Defendant's vehicle would contain evidence of a crime.[8]

---

[7] A search-incident-to-arrest exception to the warrant requirement allows police to search for and remove any weapons that might pose a danger to officer safety; it also allows police to search an arrestee to prevent the concealment or destruction of evidence.   *Chimel v. California*, 395 U.S. 752, 762-63 (1969).   In *Gant*, the Supreme Court reexamined the search incident to arrest doctrine in the context of the search of an arrestee's vehicle and returned its focus to *Chimel*-like justifications for the exception.   The Court limited its prior holding in *New York v. Belton*, 453 U.S. 454 (1981), and held police are permitted to conduct vehicle searches incident to arrest "when an arrestee is within reaching distance of the vehicle or it is reasonable to believe the vehicle contains evidence of the offense of arrest."   *Gant*, 556 U.S. at 346-47 (also recognizing other "established exceptions to the warrant requirement" for vehicle searches, for example when there is reasonable suspicion that a non-arrestee passenger is "dangerous" and might access weapons in the vehicle, or when there is "probable cause to believe a vehicle contains evidence of criminal activity," even if not the "offense of arrest," and citing cases).

[8] Perhaps the Government could have presented argument and evidence that the search of the truck was incident to the arrest of Defendant's girlfriend, who did not flee, making *Gant* relevant, but the Government did not do so.   Accordingly, it is not necessary to consider the girlfriend's arrest in connection with any of the arguments raised by the parties.   The Government also could have, but did not, argue the search of at least the floorboard area of the truck was permissible under *Gant* because it was reasonable to believe the truck contained "evidence relevant to the crime of arrest," assuming Defendant was arrested on drug charges at the same time he was arrested for evading arrest.   *Gant*, 556 U.S. at 343 (quotation marks and citation omitted).   The Government does make two alternative arguments to probable cause for the search of the truck; that is, the search

20

"Under the automobile exception to the warrant requirement, 'an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime.'"   *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013) (quoting *United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012)); *see also Carroll v. United States,* 267 U.S. 132, 149 (1925) ("[I]f the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.").   In *United States v. Galaviz*, the Sixth Circuit elaborated on the mobility factor of the automobile exception to the warrant requirement:

> The automobile exception allows officers to search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime.   This exception has traditionally been based on the ready mobility of the automobile, which created an exigency sufficient to excuse failure to obtain a search warrant.   Recent cases have clarified that the automobile exception need not rest on an independent showing of exigency, because even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.

645 F.3d 347, 355 (6th Cir. 2011) (citations, quotation marks, and alterations omitted); *see also Carter v. Parris*, 910 F.3d 835, 839 (6th Cir. 2018) (holding "[a]lthough the Fourth Amendment generally requires police to obtain a warrant before performing a search, law enforcement may 'search a vehicle without a warrant if they have probable cause to believe that the vehicle contains

---

was lawful because Defendant abandoned the truck when he fled and also because the inevitable discovery doctrine applies.   Defendant disputes each argument.   As I conclude there was ample probable cause for the search of the truck, however, it is not necessary to also address the alternative arguments raised by the Government regarding the search of the truck.   Likewise, given my findings and conclusions, it is not necessary to address the Government's generic "good faith" argument.

evidence of a crime.'" (quoting *Galaviz*, 645 F.3d at 355)), *cert. denied*, 139 S. Ct. 2703 (2019).

"If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may, without a warrant, search "any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S. at 347 (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)); *see also United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) ("Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime."). "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Ferguson*, 8 F.3d at 392 (quoting *Bennett*, 905 F.2d at 934). "Probable cause exists where 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) (quoting *Gates*, 462 U.S. at 238). The determination is a "commonsense, practical question" based upon the totality of the circumstances. *Gates*, 462 U.S. at 230-31. "This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective," taking into account law enforcement training and experience. *Ferguson*, 8 F.3d at 392.

As mentioned above, collective knowledge is imputed "among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Lyons*, 687 F.3d at 766; *accord Woods*, 544 F.2d at 260; *Rodriguez-Suazo*, 346 F.3d at 650; *Nagle*, 892 F.2d at 495. The same holds true for a search based on collective knowledge. *States v. Perkins*, 994 F.2d 1184, 1189 (6th Cir. 1993) (finding that probable cause existed as a matter of the collective knowledge of all the officers and agents investigating a case for search of vehicle).

22

Defendant's post-hearing argument appears to acknowledge that probable cause may be established from the collective knowledge of the police, rather than solely from the officer who actually made the arrest/search. However, he also appears to assert that the officers at most had only probable cause to believe that Defendant committed the crime of evading arrest, and they merely supposed Defendant might be armed or have a gun in the truck [Doc. 192 at Page ID # 1127-28]. Defendant essentially ignores all of the evidence showing probable cause to believe that he was using his truck for drug trafficking activities. To the extent Defendant persists in his "innocent" behaviors claim, the aggregation of Defendant's surveilled and monitored activities, even *if* each had a potentially innocent explanation, amount to reasonable suspicion of drug-related crimes as noted above. *See United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999) (individual acts which could be seen as innocent may be aggregated to establish reasonable suspicion); *see also United States v. Jenkins*, 266 F. Supp. 3d 980, 986-87 (E.D. Mich. 2017) ("Officers are entitled to 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

I have concluded this reasonable suspicion ripened into probable cause for Defendant's arrest upon Defendant's flight. This same probable cause supports the search of Defendant's truck. Moreover, DEA predicted Defendant might attempt to flee the scene based on past behavior, and Defendant did so. Therefore, it was certainly reasonable and prudent to assume Defendant was armed as also predicted by DEA. I **FIND** there was more than a fair probability that contraband or evidence of a crime would be found in the truck, which Defendant had just used to engage in a high-speed chase and then fled from, leaving his girlfriend/potential witness behind. *See Gates*, 462 U.S. at 238; *Lyons*, 687 F.3d at 764.

23

To the extent Defendant has not conceded the collective knowledge issue, I **FIND** all of the on-scene law enforcement officers had abundant probable cause to search Defendant's truck. *See Lyons*, 687 F.3d at 766 ("the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." (citing *Dorsey v. Barber*, 517 F.3d 389, 396 (6th Cir. 2008)). I acknowledge the doctrine "is not without its restrictions." *Id*. However, it is well-established that courts may impute collective knowledge "among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware" of the specific relevant facts. *Id*. at 766 & 766 n.4; *see also Perkins*, 994 F.2d at 1189; *Jenkins*, 266 F Supp.3d. at 987. As held in *Lyons*,

> it is immaterial that the troopers were unaware of all of the specific facts that supported the DEA's reasonable suspicion analysis. The troopers possessed all the information they needed to act—a request by the DEA (subsequently found to be well-supported) that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle. To be sure, the troopers' testimony at the suppression hearing was skeletal at best. However, the lack of detail reflected in the troopers' testimony was perhaps understandable given the urgency of the circumstances.

687 F.3d at 768-69.

As stated above, the information possessed by DEA before the attempted stop, in combination with Defendant's dangerous flight, provided probable cause to believe the truck contained evidence of criminal activity such as drug trafficking, making the warrantless search lawful. *Perkins*, 994 F.2d at 1189. It follows that the search of the truck by responding officers is lawful and does not violate the Fourth Amendment, even if the Government has not proven exactly which responding officer initiated the on-scene search that discovered the gun.

24

Applying the probable cause standard and under the totality of the circumstances, I **FIND** Defendant's truck was properly searched without a warrant or consent. Accordingly, this aspect of Defendant's motion to suppress should be denied.

## IV.     CONCLUSION

For the reasons stated above, I **RECOMMEND**[9] that Defendant's motion to suppress [Doc. 145] be **DENIED** in its entirety.

**ENTER**:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Case 1:19-cr-00046-TRM-SKL     Document 194     Filed 12/05/19     Page 25 of 25
PageID #: 1155